## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERNDIVISION

| | |
|---|---|
| CHRISTOPHER JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:13-CV-00105-JAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Christopher Jones' ("Jones") application for disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, et seq.

### I.    Background

On December 7, 2010, Jones filed an application for disability insurance and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. (Tr. 11, 212)  The Social Security Administration ("SSA") denied Jones' application. (Tr. 11, 118-119)  Following a hearing, the ALJ issued a written decision on June 8, 2012, upholding the denial of benefits. (Tr. 11-25)  Jones requested review of the ALJ's decision by the Appeals Council and, on October 9, 2013, the Appeals Council denied Jones' request for review. (Tr. 1-4)  Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Jones filed this appeal on November 26, 2013. (Doc. 1) The Commissioner filed an Answer. (Doc. 12) Jones filed a Brief in Support of his Complaint.[1] (Doc. 14) The Commissioner filed a Brief in Support of the Answer. (Doc. 19) Jones did not file a Reply Brief.

## II. Decision of the ALJ

The ALJ determined that Jones meets the insured status requirements of the Social Security Act through December 31, 2010, and has not engaged in substantial gainful activity since June 25, 2010, the alleged onset date of disability. (Tr. 13) The ALJ found Jones has the severe impairments of obesity, status post tendon release right wrist, bilateral patellar tendonitis status post arthroscopic surgeries, sleep apnea, diabetes mellitus, polyarthralgia, hypertension, dyspnea, and bipolar disorder thoracic scoliosis, osteoarthritis, fibromyalgia, and migraine headaches, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14)

After considering the entire record, the ALJ determined Jones has the residual functional capacity ("RFC") to perform sedentary work, except that he can only occasionally climb ramps and stairs. (Tr. 16) He can never climb ladders, ropes, or scaffolding. (Id.) Jones can occasionally balance, stoop, kneel, crouch and crawl. (Tr. 16-17) He must avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. 17) He must also avoid hazards such as unprotected heights and moving machinery. (Id.) Furthermore, Jones is able to understand, remember, and carry out simple instructions, have

---

[1] The Court notes that Jones' brief is not in compliance with the Local Rules of the United States District Court for the Eastern District of Missouri, which require all filings, unless otherwise permitted by leave of Court, to be double spaced typed. See E.D.Mo. L.R. 2.01. His 17-page brief, one and a half spaced, in font much smaller than standard 12-point, results in circumvention of the Court's 15-page limitation. See E.D.Mo. L.R. 4.01(D). The Court will overlook the error in this case and suggests that counsel follow the Rules in future briefs.

occasional interaction with coworkers and supervisors, and no interaction with the general public in the work setting. (Id.) The ALJ found Jones unable to perform any past relevant work, but that there are jobs that exist in significant numbers in the national economy that he can perform, including table worker, optical goods assembler, and clerical mailer. (Tr. 23-24) Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (Tr. 24) Jones appeals, arguing a lack of substantial evidence to support the Commissioner's decision.

## III.  Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.  Hearing Testimony

The ALJ held a hearing in this matter on April 11, 2012. The ALJ heard testimony from Jones and Bonnie Brasher Ward, a vocational expert.

#### 1.  Jones' testimony

At the time of the hearing, Jones, then 32-years old, was living with his girlfriend, her mother, and his three-year old daughter. (Tr. 38) He has a high school education. (Tr. 40) Jones began pursuing a bachelor's degree in sports and recreational management on August 30, 2011, in a full-time online program through Ashford University. (Tr. 40). His girlfriend prints off all of his homework assignments, he lies on the floor and works through them throughout the week, and then she types them up and submits them for him. (Tr. 50) Jones last worked in December of 2007 as a carpenter for Element Construction. (Tr. 43) He has not worked, done volunteer work, or received unemployment since his onset date of June 2010. (Tr. 41-42)

Jones weighs between 360 and 375 lbs. (Tr. 40) He is right handed. (Tr. 41) He listed his physical problems as follows: he had surgery on his right wrist and it has not fully healed; he has a lot of tingling and numbness in both of his hands; his hands are also real shaky; he had

3

surgery on both knees, making it hard to get up and down; he has breathing problems due to a partially closed nasal cavity on the right side and a partially closed right lung; asthma; he has to sleep with a CPAP machine; shortness of breath; his ankles swell; and his back is really bad. (Tr. 44)

Regarding his right wrist, Jones testified that he had surgery around June of 2009. (Tr. 45) He wears a splint on the wrist when he sleeps. (Tr. 74) Since the surgery, he "can now move [his] hand but the joint still swells really bad and the hand, even on down to the fingertips, it stay's [sic] numb." (Tr. 45) He indicated that he could not even hold a glass of water. (Id.) Jones experiences pain in his right hand on a level of 10, on a 1-10 scale, about twice a day for an hour to an hour and a half at a time. (Tr. 47) A Dr. Jackson, a rheumatoid arthritis doctor, prescribed pain medication. (Id.) Jones also reported numbness and shakiness with his left hand. (Tr. 49)

He had surgery on both of his knees. (Tr. 50) He cannot turn quickly without his knees popping. (Tr. 50-51) He also cannot stay squatting or sitting. (Tr. 51) Specifically, he reported sharp pain, "like a needle or something right behind the knee cap," on a level of 10, three to four times a day for about 45 minutes to an hour. (Id.) He takes pain medication for that pain as well. (Id.) He ices his knees four to five times a day for 20 minutes at a time. (Tr. 52)

Jones also testified that he has problems walking. After about the distance of a city block, his ankles begin to hurt real bad. (Tr. 53) He also experiences swelling in his ankles about twice a week for about 45 minutes to an hour. (Id.)

Jones additionally reports pain in his foot that a doctor told him was a nerve issue; the nerve that runs up the back side of his leg and into his back. (Tr. 54) He explained that when gets up from a seated position, if he steps on his left foot, he cannot walk on it, and instead the

4

whole leg wants to give way. (Id.) This sensation lasts for three to four hours until he works the stiffness and pain out of it. (Id.) He rates the pain as a 10. (Tr. 55)

According to a Dr. Stoneheaper [phonetic], Jones' breathing problems result from a partially closed right lung. (Tr. 55) Dr. Stoneheaper also diagnosed him with having asthma. (Id.) He is on a CPAP machine and two inhalers. (Tr. 56) Jones reports that his breathing problems make him unable "to maintain for long periods of time" and that he can maybe walk half a city block before he has to stop and take a rest. (Tr. 56-57)

He has also been diagnosed with bipolar disorder. (Tr. 57) He testified that he has "racing thoughts all the time . . . to where I'm constantly feeling like I['m] going 100 miles an hour in a hundred different directions at once." (Id.) Jones has been on Depakote for six and a half years. (Tr. 58) He takes 2000 milligrams at bedtime. (Tr. 74) The medication is prescribed by Corrie Willis, NP ("Ms. Willis"). (Tr. 58) He sees Ms. Willis every two weeks and has been seeing her for four years. (Tr. 58) His mental problems have gotten worse over the last two years and in the past six months Ms. Willis has been tweaking the medicines. (Tr. 59, 73)

He also has trouble sleeping. With the medication he's prescribed, Seroquel, and if he takes it at 8:00, he is able to go to sleep about 5:30 but wakes up about 10:00. (Tr. 74) There are some nights, about twice a week, he does not sleep at all. (Tr. 75) After about 72 hours of no sleep, his body goes into shut-down mode and no matter what he's doing, he blacks out. (Id.)

On a typical day Jones gets up at about 10:00, washes his face, and brushes his teeth. (Tr. 60) Then he works on his school work a little bit and goes about the day "as much as [he] can get done before [he] start[s] having pains." (Id.) Between 2:00 p.m. and 4:00 p.m., he watches his three-year old daughter. (Tr. 61) "[H]ow we keep track of her is I just keep her enclosed in the one area with me, like in the living room area, because other than that because there's no way

5

I could chase her." (Id.) He reports not cooking anymore because he would forget about items on the stove. (Tr. 63) He occasionally vacuums. (Id.) He sometimes, about once a month, goes with his girlfriend to the store, "just to get out and get a little exercise." (Tr. 64) He does not do any yard work or care for the family's pets. (Tr. 65) He tries to do some of the basic stretching exercises that Dr. Malberry had him do after his knee surgeries. (Id.) He does not lift weights or have any hobbies. (Tr. 66)

Jones testifies that he can sit for about 10-15 minutes, stand for about 15 minutes, can walk about half a city block, and carry about two pounds. (Tr. 68-69)

## 2.    Testimony of Vocational Expert

Vocational expert, Ronnie Ward, testified regarding Jones' vocational history as follows. Jones was a construction worker 1, code 869.664-014, with a specific vocational preparation ("SVP") of 4 and classified by the Dictionary of Occupational Titles ("DOT") as heavy work, a car detailer, code 915.687-034, with an SVP of 2, classified as medium work, a hand packer, code 920.587-018, with an SVP of 2, classified as medium work, and a warehouse worker, code 922.687-058, with an SVP of 2, classified as medium work. (Tr. 61)

For hypothetical one, the ALJ asked Ward to assume a person the same age, education, and work background as the clamant capable of performing sedentary work with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolding; occasionally balance and stoop, kneel, crouch, and crawl; need to avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases, and poor ventilation; also need to avoid hazards such as unprotected heights and moving machinery; would be able to understand, remember, and carry out simple instructions; and have occasional interaction with co-workers, supervisors, and the general public. (Tr. 79-80)   She determined that such a person would be

6

unable to perform any of Jones' past work. (Tr. 80) Such a person would, however, be able to perform a job such as table worker, code 739.687-182. SVP of 2, sedentary, unskilled work. There are 780 such positions locally and 83,000 positions nationally. (Id.) In addition, such a person could perform the job of optical goods assembler, code 713.687-018, SVP of 2, sedentary, unskilled. There are 420 such positions locally and 47,000 nationally. (Id.) Finally, there is a clerical mailer position that a person could do, code 209.587-010, SVP of 2, sedentary, unskilled. There are 680 locally and 87,000 nationally. (Id.)

For the second hypothetical, the ALJ asked Ward to assume the same limitations from the first hypothetical with the following additional limitation: that the person was limited to frequent fingering, handling, and feeling bi-laterally. (Tr. 80-81) She concluded that all of these jobs would be the same. (Tr. 80)

Finally, for the third hypothetical, the ALJ asked Ward to add the additional limitation of needing to lie down at least two hours per eight hour day. (Id.) She indicated that a person who had to lie down two hours out of eight would not be able to complete a normal work day. (Id.)

Jones' attorney asked Ward how her opinion would be impacted if she took the second hypothetical and instead of frequent fingering, handling, and feeling, said that the hypothetical individual, at an unpredictable time during the day, for one to two hours, would be unable to use their hands. (Tr. 82) Ward indicated that sedentary, unskilled work would "require a good bi-laterally [sic] use of the hands" and, therefore, that that person would be unable to perform any other jobs at the sedentary, unskilled level. (Id.) Jones' attorney also asked Ward to limit the hypothetical individual's interaction with co-workers and public to none and only occasional, superficial interaction with a supervisor. (Tr. 82-83) In so-doing, Ward said that would eliminate the identified jobs. (Tr. 83). Jones' attorney also asked Ward whether the hypothetical

7

individual would be able to successfully perform the jobs that she identified if the hypothetical individual was unable to tolerate the usual stresses of competitive employment. (Id.) She responded, "Well, if they're not able to perform the duties satisfactorily, then they're not going to be able to maintain employment." (Id.)

## B.    Medical Records

The ALJ summarized Jones' medical records at Tr. 17-23. Relevant medical records are discussed as part of the analysis.

## IV.    Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant

8

must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R.

§§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. The Commissioner may refer to the Medical-Vocational Guidelines or "Grids," 20 CFR Part 404, Subpart P, Appendix 2,[2] to meet this burden. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

---

[2] The Grids "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012). "If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table." Id. (quoting Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993)).

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V.    Discussion

In his appeal of the Commissioner's decision, Jones raises several issues. First, he alleges the ALJ erred in determining that bipolar disorder did not meet or equal the requirements of Listing 12.04. (Doc. 14 at 8-9) Second, Jones argues the ALJ improperly discounted the opinion regarding Jones' mental health limitations by his treating mental health provider, Corrie Willis, advanced practice nurse practitioner. (Id. at 9-12) Third, Jones argues the ALJ failed to consider his subjective complaints. Specifically, Plaintiff asserts his persistent efforts to obtain pain relief enhanced his credibility as set forth in SSR 96-7p. (Id. at 12-15) Fourth, Jones contends the substantial evidence of the record does not support a finding that he can perform sustained work activities and, more specifically, that the ALJ failed to consider his obesity and sleep apnea in his RFC determination. (Id. at 12, 15-16) Upon review, the Court finds substantial evidence in the record to support the ALJ's decision.

### 1.  Bipolar Disorder

Jones first argues that the ALJ erred in determining that bipolar disorder did not meet or equal the requirements of Listing 12.04. (Doc. 14 at 8-9) "The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing, a claimant must show that he meets all

of the criteria for the listed impairment. Sullivan v. Zebley, 493 U.S. 521, 531 (1990). For an impairment to be severe, a claimant must show he has a medically determinable impairment or combination of impairments. See 20 C.F.R. §§ 404.1520(c), 404.1521(a). Allegations alone will not establish disability; only evidence from acceptable medical sources (such as licensed physicians) can establish the existence of a medically determinable impairment. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).

The required level of severity for 12.04, affective disorders, is met when the requirements in both paragraph A and B are satisfied, or when the requirements in C are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. In order to meet the paragraph B criteria for Listing 12.04, the mental impairment must satisfy at least two of the following: "1. Marked[3] restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(B). Paragraph C requires the following:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(C).

---

[3] Marked is a "standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C).

The ALJ found that Jones did not meet the paragraph B criteria. Specifically, the ALJ found that Plaintiff has mild restrictions in daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation. (Tr. 15-16) The ALJ also concluded that the evidence fails to establish the presence of the paragraph C criteria because Jones has not shown any medical evidence of repeated episodes of decompensation, that his bipolar disorder has resulted in such marginal adjustment that even a minimal increase in mental demands would cause decompensation, or that he requires a highly supportive living arrangement in order to maintain even limited amounts of functioning. (Tr. 16)

Plaintiff asserts that the ALJ picked out references from the medical records that support a denial. Instead, Plaintiff details several parts of the record that detract from the ALJ's decision at step three (Doc. 14 at 8). He argues the evidence supports Plaintiff's assertions that he has good days and bad days, because the evidence shows that he has a flat affect, labile affect or low mood, reports suicidal thoughts, difficulty sleeping and low energy, hopelessness, irritability, anger, touch/easily annoyed, frustrated, and racing thoughts, memory or concentration problems, and has been assigned GAF scores below 50 on a consistent basis. (Doc. 14 at 8) This Court, however, will not reverse an ALJ's decision when it is supported by substantial evidence, even when there is substantial evidence to support a different outcome. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) ("[O]ur review is not whether substantial evidence exists to reverse the ALJ[,] . . . [r]ather we ask whether substantial evidence supports the ALJ's decision.")

Here, the ALJ relied on Plaintiff's own testimony that he is able to care for his three-year-old daughter for a few hours every day and attend school on a full time basis[4]. (Tr. 15) The ALJ also noted on Plaintiff's Function Report from December 10, 2010, Plaintiff reported he is able to drive, go out alone, shop in stores, handle money, make sandwiches daily, mow the yard for three to four hours at a time, clean the floors, wash dishes, do laundry, play video games and do puzzles for two hours a day, and talk with friends and family via Facebook. (Tr. 15-16, 233-244) The ALJ further observed that the treating psychiatric nurse repeatedly noted no problems with grooming and describes Jones as cooperative. (Tr. 15, 399-406) This observation is supported on the record by Plaintiff's primary care physician, Dr. Jamie Kauffman, D.O., who noted several times that Plaintiff was well nourished, pleasant and not in distress. (Tr. 349, 352, 354) The ALJ also indicated that the Plaintiff had experienced no episodes of decompensation. (Tr. 15)

Plaintiff also argues that his GAF score, which was below 50, reflects both severity of symptoms and functional level. (Doc. 14 at 9) But GAF scores are not determinative of a severe disability. Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010) ("[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." (internal citation omitted)) (evaluating a GAF score between 40 and 50). An ALJ, however, may not disregard a GAF score in his analysis. Conklin v. Astrue, 360 Fed. App'x 704, 707 (8th Cir. 2010) (citing Pate–Fires v. Astrue, 564 F.3d 935, 944-45 (8th Cir. 2008)). Here, in his opinion, the ALJ addressed the GAF score of 45 from April 2011. (Tr. 20-21, 659, 671) He, however, contrasted it with the records that noted Jones was groomed and cooperative with normal fund of

---

[4] The Court notes that Plaintiff is enrolled in a full-time online program through Ashford University and although he does not physically attend classes, his enrollment supports the ALJ's conclusion that Plaintiff has only a mild restriction in his activities of daily living.

information and good judgment. (Tr. 21) On this record, substantial evidence supports the ALJ's conclusion that Jones' severe impairments did not meet or equal listing 12.04.

## 2. Treating Mental Health Provider

Plaintiff argues the ALJ improperly discounted the opinion regarding Jones' mental health limitations by his treating mental health provider, Corrie Willis, advanced practice nurse practitioner. (Doc. 14 at 9-12) The SSA considers "medical source" information to come from two categories: "acceptable medical sources" and "other sources." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir.2007) (citing 20 C.F.R. §§ 404.1502, 416.902). Nurse practitioners fall into the latter category therefore the factors of SSR 06-03p apply. Id. These factors include: (1) the length and frequency of the relationship between the source and the claimant; (2) the consistency of the opinion with other evidence; (3) the degree of support provided for the opinion; (4) the quality of any explanation provided for the opinion; (5) the source's specialization; (6) any other factors that support or detract from the opinion. However, "[n]ot every factor ... will apply in every case [and][t]he evaluation of an opinion from another source depends on the particular facts of the case." SSR 06-03p, 71 Fed. Reg. 45,593-03, 45,595-96 (Aug. 9, 2006).

As a preliminary matter, Plaintiff asserts that the factors of SSR 06-03p are inconsistent with state law, specifically, the state's regulation of the practice of medicine. (Doc. 14 at 9-10) The Court is not persuaded by this argument. As the Commissioner indicates, state licensing laws do not impact or contradict federal regulations that provide guidance to a federal agency's decision-makers on how to weigh opinion evidence.

Plaintiff next asserts that the ALJ should have given Ms. Willis' opinion controlling weight. (Doc. 14 at 11) "An opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to

15

outweigh the opinion from a medical source, including a treating source." SSR 06-03p, 71 Fed. Reg. at 45596. However, SSR 06-03 clarifies that "this could occur if the 'non-medical' source has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." SSR 06-03p, 71 Fed. Reg. at 45596. Therefore, the opinion may be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ properly considered Ms. Willis' findings and opinions in accordance with these guidelines. Specifically, he discussed Ms. Willis' Medical Source Statement from April 4, 2012 and her treatment records from April 13, 2009 to April 16, 2012 (Tr. 21-22, 393-408, 611-616, 658-671). The ALJ notes that Ms. Willis reports that Plaintiff has marked limitation in his ability to perform complex work due to his racing thoughts, distractions, impulsivity and inability to concentrate for more than 15 minute periods and that Plaintiff has an extreme limitation in social functioning due to problems with anger management, mood swings, sleep impairment, depressed and anxious mood and increased irritability and concentration problems with elevated blood sugar. (Tr. 21-22) However, he explained that Ms. Willis' reports are "not consistent with the evidence" specifically that they are not supported by her own clinical findings or the Plaintiff's activity level. (Tr. 22) He also finds that there is no evidence that Plaintiff's "mental impairments have been so severe as to warrant inpatient treatment or other intensive treatment during the relevant period aside from medication management." (Id.) The Court finds that the ALJ did not err in declining to give Ms. Willis' assessment controlling weight.

16

### 3. Subjective Complaints

Jones also argues the ALJ failed to consider his subjective complaints. Specifically, Plaintiff asserts his persistent efforts to obtain pain relief enhanced his credibility as set forth in SSR 96-7p. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ does not have to explicitly discuss each factor; "[i]t is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Goff, 421 F.3d at 791.

Here, the ALJ noted many instances in which Jones' subjective complaints conflicted with the objective medical evidence. (Tr. 18-20) Regarding the Plaintiff's complaints about pain in his knee, the ALJ found that the medical records indicated that in November 2011, Plaintiff reported he was not getting pain with normal daily activity and was directed to wean off his pain medication. (Tr. 18, 371-372) Further, the ALJ discussed Plaintiff's continued effort to obtain pain relief and found that as of February 2012, Plaintiff was diagnosed with polyarthralgias with possible osteoarthritis and possible fibromyalgia and started on Gabapentin for the alleged widespread pain. (Tr. 19) The ALJ also reviewed the objective clinical findings

17

as they related to Plaintiff's mental impairments and found that they failed to support the severity of Jones' allegations. (Tr. 20) Specifically, as discussed previously, that Ms. Willis noted several times that Plaintiff was groomed, cooperative, less irritable, displayed normal speech, good attention and concentration, and intact memory. (Id.)

The ALJ additionally considered the inconsistencies between Jones' allegations and his activities of daily living, including his full time schooling and ability to watch his daughter daily. (Tr. 19) The ALJ also found that Jones' work history does little to bolster his claim, noting the inconsistency in his claims regarding when he stopped working, what he told Ms. Willis, and a report that as recently as April 2011 he builds and sells homes. (Tr. 20-21) The ALJ also reviewed the third party function reports from Plaintiff's friends, Anna and Samantha Lowery. (Tr. 21) The ALJ found that while the reports tended to support Plaintiff's allegations, they were lay opinions based on casual observation rather than objective medical testing and based upon loyalties of friendship. (Id.) The ALJ also found them internally inconsistent, describing the Plaintiff as very limited because of his conditions but also indicating a number of activities that Plaintiff could perform, including paying attention for one to two hours at a time, mowing the grass, and cleaning dishes, floors and trash. (Id.) The ALJ additionally considered medication side effects when assessing Plaintiff's credibility, finding that Plaintiff has not reported any side effects from his medications. (Id.)

Accordingly, in a manner consistent with and as required by Polaski, the ALJ considered Jones' subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility. Because the ALJ's determination not to credit Jones' subjective complaints is supported by good reasons and substantial evidence, the Court defers to his determination. Cobb v. Colvin, 2014 WL 6845850, at *14 (E.D. Mo. Dec. 3, 2014)

(citing McDade v. Astrue, 720 F.3d 994, 998 (8th Cir.2013); Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Goff, 421 F.3d at 793).

## 4. Sustained Work Activities

Finally, Jones contends that the substantial evidence does not support a finding that he can perform sustained work activities. (Doc. 14 at 12) Plaintiff asserts that, "[t]he combination of Plaintiff's chronic pain, which is well documented in the medical records, and his obesity and severe restrictive pulmonary disease would obviously not allow him to work a full 40-hour work week." (Id.) Plaintiff thereafter specifically argues that the ALJ failed to consider the effect of Jones' obesity and resulting sleep apnea on his ability to work. (Id. at 15-16)

"[Residual Functional Capacity ("RFC")] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "RFC is assessed . . . based on all of the relevant evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *2. "In the context of obesity, an ALJ should review a claimant's limitation of function[5]. SSR 02-1p, 65 Fed. Reg. 31,039-01, 31,041 (May 15, 2000). Social Security Ruling 02-1p further cautions, "[t]he effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea [as does Plaintiff]. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning." SSR 02-1p, 65 Fed. Reg. 31,039, 31,041 (May 15, 2000).

---

[5] Specifically, "[t]he functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected." SSR 02-1p, 65 Fed. Reg. 31,039, 31,041 (May 15, 2000).

The ALJ thoroughly reviewed all of Plaintiff's severe impairments and determined that that the Plaintiff has the residual functional capacity to perform sedentary work. (Tr. 16, 18) In so-doing, the ALJ made more than a cursory reference to Plaintiff's obesity and sleep apnea. (Tr. 19, 22-23) See Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) ("[W]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal.") The ALJ observed that "claimant has a body mass index of 49.5 and that as of March 2012, his weight was 345 pounds," and that he was diagnosed with mild obstructive sleep apnea worse in REM sleep in December 2010 and was directed to use a CPAP machine. (Tr. 19) The ALJ did conclude, as a result of his impairments including obesity and sleep apnea, that Plaintiff "can only occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolding; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation; and must avoid hazards such as unprotected heights and moving machinery." (Tr. 16-17) The Court finds that the ALJ's RFC assessment is supported by substantial medical evidence and takes into account both Plaintiff's obesity and sleep apnea.

## VI. Conclusion

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

20

Dated this 31st day of March, 2015.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE